IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br>                    Plaintiff, <br><br> v. <br><br> JERRY SIAKI ESTEBAN, JR., and <br> PHILLIP UIGAESE TAUEETIA, <br><br>                 Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING MOTION TO SUPPRESS** <br><br><br> Case No. 2:16-cr-00592-CW <br><br><br> Judge Clark Waddoups |

The Supreme Court has "long held that the 'touchstone of the Fourth Amendment is reasonableness.'" *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (quoting *Florida v. Jimeno,* 500 U.S. 248, 250 (1991)). "Reasonableness, in turn, is measured in *objective terms* by examining the totality of the circumstances." *Robinette*, 519 U.S. at 39 (emphasis added); *e.g.*, *United States v. Hernandez*, 847 F.3d 1257, 1268 (10th Cir. 2017) (observing that "the Fourth Amendment requires at least "some minimal level of objective justification for making [a] stop" (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989))).

The circumstances of this case test how consistently the lens of objectivity should be applied throughout a traffic stop. Ultimately, the court finds that where an officer must rely on subjective considerations to justify the search of a vehicle, the Fourth Amendment's protections are thwarted. On a number of grounds, the court concludes that the traffic stop and search in this case violated the Fourth Amendment and, therefore, the court suppresses the evidence resulting from the illegal investigatory detention and search.

# FACTUAL BACKGROUND

## A. *Traffic Stop*

On the morning of October 15, 2016, Utah Highway Patrol (UHP) Trooper Jason Tripodi was on duty in Wasatch and Summit Counties in Utah. (Evidentiary Hr'g Tr. ("Tr.") 6:17-7:15, ECF No. 40.) As a member of UHP's criminal interdiction team, Trooper Tripodi was patrolling for traffic and safety violations and other criminal activities. (*Id.* at 7:1-3, 7:20-24, 38:20-39:7.) At some point, Trooper Tripodi parked in the median of I-80 around milepost 148 or 149 facing west and monitoring eastbound traffic. (*Id.* at 9:2-20.) At approximately 8:44 a.m., Trooper Tripodi observed a silver Ford pickup truck traveling eastbound. (*Id.* at 7:25-8:3.) When the pickup passed, he noticed that the driver appeared "hidden behind the door pillar, almost leaned back," so that he could only see the driver's arms "locked in the ten and two position," as on a clock. (*Id.* at 8:5-11.) This caught Trooper Tripodi's attention "because the driver had no visibility out the side windows, and usually that's a safety issue," as well as "a sign that you're trying to either hide from something or, you know just hide from someone." (*Id.* at 8:19-24.) Trooper Tripodi acknowledged that the positioning was not illegal and that people of different sizes assume different positions in vehicles. (*Id.* at 40:24-41:25.)[1] Trooper Tripodi also noticed that the pickup had a California license plate. (*See id.* at 42:7-10; *see also id.* at 15:20-23.) He testified that officers target areas where drugs may be sourced and "take more interest" in "high-probability areas" like California, Nevada, and Arizona. (*Id.* at 42:4-6.)[2]

---

[1] The driver, Mr. Esteban, was later determined to be 6' 2" and weigh 320 lbs. (Mot. to Suppress ¶ 5, ECF No. 23.)

[2] In fact, Trooper Tripodi's logs for the week before and after this stop (October 8-22, 2016) showed that 35 out of 37 warning citations issued in that period were to vehicles with out-of-state license plates. (Tr. 65:16-14.) Trooper Tripodi acknowledged that one "could look at any of the surrounding states and say it could be a source state." (*Id.* at 66:13-14.) He also acknowledged that he is focused on out-of-state vehicles not because of any particular driving behavior, but because of his criminal interdiction work. (*Id.* at 66:20-25.)

Based on these observations, Trooper Tripodi exited the median and began following the pickup. (*Id.* at 9:23-10:2, 42:1-10.) The dash camera video shows the silver pickup driving in the right lane on the two-lane divided highway, with Trooper Tripodi following farther behind in the passing lane. (*See* Dash Camera Video ("Dash Cam.") 8:44:17, Gov't Ex. 1; Tr. 12:15-25.) Trooper Tripodi did not observe any unsafe driving at this time. (Tr. 44:23-45:1, 51:12-20.) Farther ahead, an emergency police vehicle with flashing lights had pulled another vehicle to the side of the highway. (Dash Cam. 8:44:20-40; Tr. 13:9.) The pickup truck, still several car lengths ahead of Trooper Tripodi, signaled for at least two seconds and changed lanes into the left lane, providing more space to the emergency vehicle. (Dash Cam. 8:44:20-33; Tr. 10:12-16, 13:3-7.) Trooper Tripodi observed that this lane change complied with traffic law. (Tr. 46:25-47:4.)

At this point, Trooper Tripodi accelerated from about 68 mph to 77 mph, closing the distance between his vehicle and the pickup, though he believed he maintained a safe following distance. (*See* Dash Cam. 8:44:27-43; Tr. 50:11-16, 73:14-19.)[3] After passing the emergency vehicle on the side of the road, the pickup signaled again and moved back into the right lane. (*See* Dash Cam. 8:44:27-49.) This time, Trooper Tripodi thought the pickup did not signal for a full two seconds prior to moving lanes, which is a traffic infraction under Utah law. (*Id.* at 8:44:43-8:45:12; Tr. 11:1-6.)[4] Trooper Tripodi pulled behind the pickup, activated his lights, and

_____

[3] Trooper Tripodi recalled that the speed limit was 70 mph at this point. (Tr. 48:12-17.)
[4] Utah Code Ann. §§ 41-6a-804(1)(b) & (5) make it an infraction to change lanes without signaling "continuously for at least the last two seconds preceding the beginning of the movement." The parties dispute whether the pickup in fact signaled for two seconds before changing lanes. Trooper Tripodi testified that he observed the pickup failed to signal for two seconds prior to moving back into the right lane. (Tr. 10:4-8.) Later, while viewing the dash camera video in court, Trooper Tripodi reiterated that the signal and lane change appear to occur "pretty close" to the same time. (*Id.* at 14:4-6.) Upon the court's own review of the dash camera video, at reduced speed, the pickup appears to signal and begins to move into the right lane before a full two seconds passes, although two seconds elapse before the lane change is complete and no cars are present in the right lane. (*See* Dash Cam. 8:44:40-46.) Therefore, the video appears to corroborate Trooper Tripodi's observation. Mr. Esteban contends, nonetheless, that

initiated a traffic stop. (Dash Cam. 8:45:12-46; Tr. 14:4-24.) While the pickup yielded to the emergency lights, Trooper Tripodi radioed the stop and the license plate number to dispatch. (Dash Cam. 8:45:28-43; Tr. 15:1-5, 57:6-10.)

When the vehicles came to a stop on the side of the highway, Trooper Tripodi approached the pickup on the passenger side and observed that the truck bed was covered. (Dash Cam. 8:45:58-46:04; Tr. 15:9-12.) He saw the pickup had two male occupants, and the passenger appeared to be waking up. (Tr. 15:12-15.) He also noticed some dress shirts hanging in the back, along with luggage. (*Id.* at 15:16-19.) He would later identify Jerry Siaki Esteban as the driver and Phillip Uigaese Taueetia as the passenger. (*See id.* at 33:2-7.)

Arriving at the passenger window, Trooper Tripodi introduced himself and apologized for waking the passenger. (Dash Cam. 8:46:04-09.) He told the occupants that the reason for the stop was the failure to signal for two seconds before changing lanes. (*Id.* at 8:46:10-15.) Trooper Tripodi thanked Mr. Esteban for doing so during the first lane change, but advised that he needed to have signaled longer during the second lane change. (*Id.* at 8:46:16-24.) He requested Mr. Esteban's license, registration, and proof of insurance, and then said: "I'm not going to cite you for [the violation], we just need to document all of our stops." (*Id.* at 8:46:25-234; Tr. 16:14-18, 17:4-6.)

Trooper Tripodi continued to engage in conversation with the men while Mr. Esteban retrieved his documents. Trooper Tripodi asked if they were taking shifts driving and where they were headed, to which they responded St. Paul, Minnesota. (Dash Cam. 8:46:39-47:01; Tr. 17:12-14.) The passenger then asked whether or when would it start snowing, a question that

the Trooper could not have made this judgment in real-time in the field. But the court need not resolve this attack on the Trooper's perception because, as discussed *infra*, the court finds the violation was provoked by Trooper Tripodi and, thus, the stop was not valid at its inception. In addition, even assuming the stop was valid at its inception, the court determines that suppression is warranted on other grounds as well.

Trooper Tripodi found odd because it was a "shift in the topic of discussion" and an "odd first thought" upon waking up. (Tr. 17:20-18:7.) Trooper Tripodi spent the next minute attempting to convince Mr. Esteban to return to his vehicle to speak with him while he filled out his paperwork. (*Id.* at 18:8-12; Dash Cam. 8:47:32-48:37.)[5] Mr. Esteban ultimately declined. (Tr. 18:13-15, 19:10-25.) Trooper Tripodi admitted that asking a driver back to his police car while a passenger remains in the stopped vehicle is not the safest way to conduct a stop, and is not related to the stop, but is "the best way to get more information." (*Id.* at 64:1-8, 77:17-25.)

Trooper Tripodi returned to his vehicle and pulled up the "Citation Report" on his computer, which he uses to document every stop made, including those where only a warning is given. (*Id.* at 18:18-24.) He also immediately opened a chat system to ask UHP Trooper Kade Loveland to assist him on the scene while he filled out the citation report. (*Id.* at 20:8-14, 21:7-9.) Trooper Tripodi testified that he had his "initial suspicions" of the men based on "their behavior in the vehicle, the way that they were taking shifts and driving straight through, the hesitations to answer certain questions, like would you be okay returning to my vehicle." (*Id.* at 20:10-23.) Trooper Tripodi also noted that the passenger was doing most of the talking, when usually he converses only with drivers during traffic stops, and that the passenger changed the topic of conversation. (*Id.* at 20:24-21:4, 79:3-25, 85:24-86:13.)

Trooper Tripodi and Trooper Loveland regularly work together, and Tripodi knew that Loveland was just a few miles down the road. (Tr. 22:7-14.) Trooper Loveland is a certified narcotics detection dog handler. (Tr. 88:4-10; *see* Gov't Ex. 12.) Starting at 8:49 a.m., just after

---

[5] Trooper Tripodi testified that one of the places at which he trained was Desert Snow, which is a privatized, nationwide training program that teaches officers how to identify behaviors that could be suspicious and increase an officer's ability to support cause to search vehicles. (*See* Tr. 62:19-63:19, 77:9-25.) This technique of an officer asking drivers to accompany them back to the police car while the officer fills out a citation or other documentation is something this court has seen become increasingly part of routine traffic stops.

Trooper Tripodi had returned to his vehicle, the troopers had the following exchange on chat:

| | |
|---|---|
| jtripodi | yoo |
| kloveland | need 78[6] |
| jtripodi | si, if youre not on anything good |
| kloveland | cleared now |
| jtripodi | just from the window have some suspicions, doesnt want to come talk |
| kloveland | occupants in the car? |
| jtripodi | 2 |
| kloveland | copy |

(Gov't Ex. 2; *see* Tr. 22:2-23:21, 59:23-24.) The entire exchange lasted a little less than a minute. (*See* Gov't Ex. 2 (showing timestamps from 14:49:01-14:49:50 GMT).)

Trooper Tripodi continued filling out the citation report while waiting for Trooper Loveland to arrive. (Tr. 23:25-24:1.) Regarding documentation, Trooper Tripodi testified that his unit supervisor trained them to document every stop, even when an officer does not intend to cite a person, so that there is "a paper trail" leading back to the stop. (*Id.* at 24:5-15, 53:20-54:2, 55:10-14, 71:14-72:9.) He acknowledged that no written department policy required documentation of every stop, and that an officer is authorized to give a verbal warning. (*Id.* at 54:3-57:5.) But he testified that he only gives verbal warnings in "less than one percent" of cases and usually when there is some other emergency for which he is called away. (*Id.* at 70:20-71:8, 72:10-15.) Trooper Tripodi estimated that it takes him an average of five to seven minutes to complete a citation report. (Tr. 27:5-8.)

After Trooper Loveland appeared on the scene a few minutes later, and while still completing the citation report, Trooper Tripodi called dispatch for records checks on Mr. Esteban's license validity, wants and warrants, and a "Triple I" check for his criminal history. (*Id.* at 27:10-23; *see* Dash Cam. 8:52:32-48.) The Triple I check generally takes longer than the license and warrants checks, and Trooper Tripodi admitted that it was not related to documenting

---

[6] "78" refers to 1078, a code for requesting another unit. (Tr. 22:2-5.)

the stop, but that it was for "officer safety issues and also for other means as well." (Tr. 58:11-59:18.)

When Trooper Loveland appeared, he immediately proceeded with the canine sniff without further communication with Trooper Tripodi. (Tr. 95:18-96:2, 107:1-5; *see* Dash Cam. 8:51:57-53:20.) Trooper Loveland and Drago, his certified narcotics detection dog, started at the tailgate. (Tr. 98:12-13; *see* Dash Cam. 8:53:20-22.)[7] Trooper Loveland and Drago do several laps around the pickup, for a total of about two minutes. (*See* Dash Cam. 8:53:22-55:31.) On the first passes, Trooper Loveland testified that Drago moved quickly around the vehicle to the tailgate again, where he stopped and did a "head check," i.e., changed directions and kept investigating, then continued to move around the vehicle and investigate the tailgate intensely, including almost squatting at the tailgate a few times. (*See* Tr. 98:25-99:7, 109:20-111:4; Dash Cam. 8:53:22-54:01.)[8] During these passes, Trooper Loveland saw "alerts," or the dog's natural change in behavior. (Tr. 100:4-11.) On the next passes, Trooper Loveland pointed to various places on the vehicle, focusing on the seams where odor could exit the vehicle. (*Id.* at 100:14-21; *see* Dash Cam 8:54:02-57.) After multiple passes around the pickup, Trooper Loveland then brought Drago back to the tailgate and detailed the high seam of the tailgate, which he hadn't previously, because Drago "had alerted" there before. (Tr. 100:25-101:4; *see* Dash Cam. 8:55:00-30.) Trooper Loveland testified that, at that point, Drago "show[ed] a final indication by

---

[7] Trooper Loveland and Drago are both Peace Officer Standards and Training (POST) certified. (Tr. 91:14-16; *see* Gov't Exs. 10-12 (certifications).) The POST training was four months long and consisted of both classroom and reality-based training on narcotics. (Tr. 89:15-90:3.) Loveland and Drago also do weekly trainings consisting of four hours of narcotics training in a controlled environment and four hours of patrol training. (*Id.* at 91:17-92:17.) Trooper Loveland and Drago have worked together for at least two years. (*Id.* at 90:4-9.)
[8] Trooper Loveland clarified that Drago appears or attempts to "squat" in the video when "his legs are bent and his rump is down." (Tr. 110:14-24.)

freezing and staring at the [passenger side] seam." (Tr. 101:6-9.)[9] Trooper Loveland also

concedes, however, that Drago did not give his "final trained response," which is to freeze/stop,

stare, and sit. (Tr. 101:9-13, 112:1-8, 113:3-23.)[10]

On the way back to his vehicle, Trooper Loveland informed Trooper Tripodi that Drago

was indicating on the pickup's tailgate. (Tr. 29:4-7; Dash Cam. 8:55:34-37.) Trooper Tripodi

testified that he was finishing up the citation report at that time, though he did not believe it was

complete because he had not yet printed it to give to Mr. Esteban. (Tr. 28:25-29:2, 38:10-14.)

Based on Drago's indication, Trooper Tripodi decided to search the pickup. (*Id.* at 29:24-25,

30:21-23.)[11] Prior to starting the search, Trooper Tripodi went to retrieve the passenger's

identification in order to identify and run records checks on him. (*Id.* at 29:14-30:23, 37:13-16.)

Returning a couple minutes later without Drago, Trooper Loveland explained the dog's

indication to Trooper Tripodi, stating that Drago "alerted" on the tailgate and "squatted like he

was gonna sit," but that "it was weird because he wouldn't sit." (Dash Cam. 8:56:49-57; Tr.

113:8-23.) Trooper Tripodi did not know why Drago did not sit, but speculated that Drago was

---

[9] The court cannot perceive from the dash camera video all the alerts and indications to which
Trooper Loveland testifies. (*See* Dash Cam. 8:53:22-55:31.) Later in the testimony, Trooper
Loveland confirms that, to some extent, only he can perceive some of the alerts or indications.
Therefore, the court must understand Trooper Loveland's perceptions in order to evaluate the
reliability of the canine sniff in this case.

[10] The "final trained response" is the trained behavior a canine exhibits to communicate to his
handler that he has detected the odor of narcotics. (Tr. 115:6-13, 150:20-25.) Trooper Loveland
speculated that Drago did not give his final trained response because he is also "trained to stay
with the odor" and has a desire to stay with it, particularly if it is high. (*Id.* at 102:5-11.) Trooper
Loveland testified that Drago appeared to be "detecting odor high on the vehicle." (*Id.* at 102:19-
20.)

[11] About a minute prior to Trooper Loveland notifying Trooper Tripodi of the canine indication,
dispatch relayed to Trooper Tripodi that Mr. Esteban's license was valid and that the Triple I
check showed a criminal history. (Tr. 28:9-15.) Because Trooper Tripodi does not detail the
criminal history or testify that he relied on it in deciding to conduct the search, however, the
court does not consider it in its analysis.

"fringing the odor," meaning that he was on the edge of the scent, and that he could not leave it. (Dash Cam. 8:56:57-57:06; Tr. 116:2-9.)

The officers removed Mr. Esteban and Mr. Tauteeia from the pickup, and started the search at the rear of the vehicle, where Drago had indicated. (Tr. 31:20-33:1.) They located approximately two pounds of methamphetamine in the tailgate and arrested both men. (*Id.* at 35:6-10, 37:4-6; *see* Gov't Exs. 3-9.)

In total, approximately ten minutes passed from the pickup's stop on the side of the road to when Trooper Loveland informed Trooper Tripodi of the canine indication and Tripodi determined to search the vehicle. (Dash Cam. 8:45:45-55:35.) Trooper Tripodi testified that his traffic stops generally last ten to fifteen minutes on average. (Tr. 27:1-3.)[12]

### B. Canine Sniffs

#### 1. Training and Certification

Defendants called Dr. Lawrence Myers to testify about the behavioral science on reliable canine training, both generally and as applied to this case. Dr. Myers is a veterinarian and has a M.S. in Zoology, specializing in animal behavior and sensory function, and a PhD in neurophysiology. (Tr. 145:21-25.) He studied canine behavior and training as a professor at Auburn University for 33 years and founded the Institute for Biological Detection Systems there in 1989. (*Id.* at 146:1-25, 162:2-7.) Many law enforcement agencies have enlisted his assistance for their canine training programs, including the military police, FBI, Department of the Treasury, U.S. Customs, and the FAA, as well as many state and local groups, including the

---

[12] Culling from Trooper Tripodi's daily log for the weeks prior to and after this stop, defense counsel pointed out three other stops during this period for similar violations (i.e., failure to signal for two seconds and following another vehicle too close) wherein warnings were issued, and noted that these stops lasted six, seven, and nine minutes each. (Tr. 68:2-69:9.) On re-direct, the government pointed to other stops in the log from this period that took longer (between twelve and twenty-two minutes), though the purpose of these stops was not discussed. (*Id.* at 70:1-16.)

Florida Department of Law Enforcement, Connecticut State Police, and New York City Police Department Bomb Squad. (*Id.* at 147:17-148:13.) Though he has consulted for these agencies, he has never implemented or been in charge of a dog training program himself. (*Id.* at 161:8-16.) He has testified in court about fifty times, once or twice for the prosecution and the remainder for the defense. (*Id.* at 160:13-20.)

Dr. Myers affirmed that there is no universally accepted way to properly train a canine to accurately detect odors. (*Id.* at 148:17-149:2.) There are, however, three foundational principals that behavioral science would require be applied in any canine testing and certification to ensure its reliability: repeated, double-blind, and randomized testing. (Tr. 149:3-15, 165:18-166:7.)

In this context, "randomized" means placement of a hide in a location selected by a random number generator rather than a human decisionmaker. (*Id.* at 149:18-150:4.)[13] For example, Dr. Myers worked with an explosive-detecting canine program where the canines would reliably search the wheel wells of cars because that was an easy place for testers to hide the target, and so the training was not properly randomized. (*Id.* at 150:6-11.)

As to double-blind testing, Dr. Myers noted that single-blind (or blinded) testing—where the observer or evaluator is present in the training and knows where the hide is located—reduces confidence in the reliability of the search because the observer can give off subtle cues to both the canine and the handler. (*Id.* at 153:19-154:9, 156:24-157:1.) Dr. Myers discussed a 2011 study at U.C. Davis where certified narcotics and explosives-detecting canine-handler teams were brought to an area where no narcotics or explosives had ever been present (a brand new building). The researchers hinted to the handlers that narcotics and explosives were present, and

_____

[13] For full randomization, a location would be subdivided into quadrants and each quadrant assigned a number, after which a random number generator would produce the number of the quadrant (including zero) in which to place the hide. (Tr. 149:23-150:4.) If one excluded areas where a hide is not feasible, the procedure would be considered pseudo-random. (*Id.* at 166:16-24.)

found that about 85% of the canine runs produced one or more false alerts, where the canine showed a final trained response to its handler though no target odors were present. (*Id.* at 154:14-156:5.)[14] Dr. Myers noted that cuing by a handler or observer is not usually intentional or conscious, but that canines pay attention to their environments as well as their handler. (*Id.* at 154:5-7, 156:11-17.)

In rebuttal, the government called Sargent Wendell Nope to testify about the Utah Department of Public Safety POST canine training program and his opinion on Drago's indication in this case. Sgt. Nope has been running POST's canine training and certification program in Utah for 27 years and has directly trained or supervised the training of nearly 4,000 police dogs. (*Id.* at 173:17-14:8, 180:7-10.) He started out as a canine handler and trainer, handling seven dogs personally, and qualifies as a police dog teaching judge, the highest level of certification in the police dog industry. (*Id.* at 180:2-7.) The POST program was initiated to establish reasonable, competent, and consistent canine training in various disciplines (narcotics, explosives, patrol, etc.) around the state. (*Id.* at 174:16-22.) The program uses reality-based training to imitate the circumstances canines face when deployed, and attempts to bring canines to a trained and certified reliable state in "the most efficient manner possible." (*Id.* at 175:7-18.) The POST training program has been used by some of the states surrounding Utah as well as the U.S. Secret Service and Navy, the Iraqi police, and the South Korean government. (*Id.* at 178:7-179:7.) Sgt. Nope believes that about one-fourth of the police dogs in the United States are trained either identically or similarly to Utah's POST program. (*Id.* at 186:15-18.)

Sgt. Nope testified that POST uses single-blind testing for all detector dogs because it "works best" to achieve POST's "goal and objectives." (*Id.* at 175:23-24.) He acknowledged that

---

[14] On cross-examination, Dr. Myers acknowledged a Portuguese study that disagreed with the U.C. Davis study, though no further detail on this study was provided. (Tr. 160:21-161:7.)

double-blind testing "is a wonderful way of determining credibility and reliability of a dog, but it does not offer the trainer or the administrator the ability to evaluate in a graded fashion." (*Id.* at 176:5-9.) Sgt. Nope stated that the evaluator must know where the hide is located to assess the skills of a dog on a graded scale, particularly during the initial training period, and that POST goes to "great lengths" to train evaluators not to present "even subtle ideas or clues or cues to the dog or the handler." (*Id.* at 177:2-25.) But when asked why the evaluator could not simply view a test by video, so that the evaluator was not physically present during the test, Sgt. Nope replied that they had tried such a process and found that it was "tedious" and "would not allow us to accomplish what we are required to within a given time." (*Id.* at 188:25-189:4.)

2. Final Trained Response

Regarding the final trained response, Dr. Myers testified that a properly trained canine communicates the detection of a specific odor to the handler only through the final trained response. (Tr. 150:20-8.) The final trained response is necessary to take the subjectivity of the handler out of the equation, Dr. Myers opined, because a canine can be interested in any number of odors and display essentially the same behaviors. (*Id.* at 151:14-23.) The final trained response can be changed intentionally or can fade if not continuously reinforced. (*Id.* at 168:23-169:4.) A properly trained canine who demonstrates a final trained response will be reliable to about the percentage shown by repeated testing, i.e., a canine that is 90% accurate in detecting narcotics would support a 90% probability that narcotics are or were present where the canine demonstrated the final trained response. (*Id.* at 152:22-153:12.) But if the canine shows no final trained response, "you can't tell anything. You may suspect, but you can't tell anything. The dog has not communicated to you that in fact the odor it is trained to find is present." (*Id.* at 157:2-7.)

Dr. Myers puts no confidence in a canine's behavior if it does not show a final trained response. (*Id.* at 157:8-11.)

Based solely on his review of the video of the canine sniff in this case, Dr. Myers found "no value . . . whatsoever" in the indications Drago displayed. (*Id.* at 157:21-158:3.)[15] Dr. Myers explained that Trooper Loveland may have suspected, but, from a training and scientific perspective, Drago's behavior was not reliable. (*Id.* at 158:4-11.) Dr. Myers agreed that, depending on how a dog is trained, the dog may have a tendency to "linger" with the odor, but contended that a properly trained dog smelling the target odor will exhibit the final trained response. (*Id.* at 171:13-172:9.)

In contrast, Sgt. Nope believes, based on his experience, that the final trained response is just one way a canine may indicate to a handler that he has "truly found" the target odor. (*Id.* at 180:21-181:12.) Viewing the sniff in this case, Sgt. Nope described Drago's performance as "a reasonably skillful initial sniffing of the vehicle itself" and confirmed that Drago exhibited "two of the three elements associated with the trained final response." (*Id.* at 180:17-20, 183:9-15.) Sgt. Nope did not believe that Trooper Loveland exhibited any subtle cuing behavior, but acknowledged that he did not have sufficient prior experience with Loveland to know of his typical behavior with Drago. (*Id.* at 203:6-204:11.)[16]

Sgt. Nope discussed how Malinois, Drago's breed, are "highly driven" to not only detect a target odor, but to locate its source. (*Id.* at 182:17-183:5.) In fact, a dog may be "attempting to get to the source of the odor," or strongest part of the odor, when they fail to show the final trained response, but Sgt. Nope opined that such behavior still reliable because the dog has

---

[15] Dr. Myers conceded that he has never interacted with or trained Trooper Loveland or Drago himself. (Tr. 165:4-12.)

[16] In every case, Sgt. Nope has testified for the prosecution, and he has yet to observe an unreliable canine indication in any of them. (*Id.* at 198:24-199:11.)

become more targeted and "because the dog is doing its job. It's trying to find the odor." (*Id.* at 181:13-182:9, 183:16-184:17.)

Sgt. Nope has developed an "alert matrix" with nine behaviors that may indicate the canine has detected the target odor. (*Id.* at 184:18-25.) These behaviors include "a physical transition from general sweeping behavior to a targeted, more focused area"; increased intensity of search; changed breathing from general sniffing to deep inhalation; hesitation to leave a spot; changes in physical characteristics, like the ears going forward, the tail coming up and wagging, and increased physical energy generally; and the disregard of distractions. (*Id.* at 193:1-194:12.) He explained that if a canine exhibits "several" of these behaviors in a "profound manner," they can indicate to the handler that the dog has detected a target odor. (*Id.* at 195:9-12.) When asked how many behaviors must be present and at what intensity, Sgt. Nope acknowledged that even the presence of one behavior could be sufficient, so long as it was "so profound as to be without reasonable question." (*Id.* at 201:9-202:8.) When asked why, then, train canines to exhibit a "final trained response," Sgt. Nope explained that the final trained response is like a "home run where there is no question that the dog has performed appropriately" and is the "optimal display of success." (*Id.* at 195:17-20, 196:7-10.) In fact, Sgt. Nope conceded that POST would not certify a canine that could not consistently show a final trained response. (*Id.* at 192:15-17.) But Sgt. Nope believes that he has personally observed when a canine is sensing narcotics, as opposed to something else, through the canine behaviors he has identified. (*Id.* at 197:16-21.)

For his part, Trooper Loveland believes he can tell when Drago is sensing the odor of narcotics rather than, for example, food or dead animals, by observing the "intensity" of his behaviors as well, even if Drago does not give his final trained response. (Tr. 116:16-118:23.) Trooper Loveland noted that Drago is "trained to sit, but he can't always sit." (*Id.* at 112:14.)

Defense counsel submitted video of three other traffic stops where Drago was deployed to conduct a sniff of the vehicle. (*See* Defs.' Ex. 3.) The video shows Drago executing his final trained response during one stop and then "indicating" during another stop. (*See id.*; Tr. 120:6-121:13.) In the final stop, Drago again "indicates" and Trooper Loveland immediately throws him a tug toy as a reward. (*Id.* at 122:24-124:23.)[17] Defense counsel also presented five training or deployment logs in the days before and after this stop showing that Drago indicated to the presence of drugs when none were found, often with no explanation. (*See id.* at 125:5-135:7.) An additional training log from May 2017, about seven months after the stop, showed Trooper Loveland continuing to work on building Drago's "final indication" in the presence of a narcotics hide. (*Id.* at 125:11-127:8.)[18] Trooper Loveland testified that he believes Drago is reliable because "he's right more often than not," and that Drago does not indicate on the majority of roadside sniffs. (*Id.* at 138:16-139:14.)

Throughout the hearing, the terms "alert," "indication," "final indication" and "final trained response" were often used interchangeably and without distinguishing between them. Trooper Loveland confirmed that "indication" and "final trained response" are equivalent in his mind. (*Id.* at 121:14-20, 122:17-21.) When pressed on how an indication can substitute for a final trained response, Trooper Loveland explained that it may be "the best indication he can give me at the time," based on the circumstances. (*Id.* at 121:24-125:3.) An exchange between Trooper Loveland and the court is revealing on this issue:

> THE COURT: Tell me how many different ways that you believe [Drago] displays to you that drugs may have been present.

---

[17] Earlier in the hearing, Trooper Loveland testified that he does not reward Drago roadside unless and until he verifies the presence of narcotics in the vehicle. (Tr. 103:8-19.) Dr. Myers testified that this video showed Loveland rewarding Drago for the "improper" behavior, thereby training the dog "not to give its final indication." (*Id.* at 170:3-11.)

[18] The six logs were pulled from over 300 pages, (Tr. 136:10-23), which were not admitted into evidence.

THE WITNESS: So, like I said, the stop and stare is always there. And then the three that he would usually do would either be standing if it's a high odor, the sit, which is obviously the preferred method, or sometimes if it's really low, like I've seen him go under cars, he's actually laid down on his stomach and stayed there on his stomach.

THE COURT: And how do you know that these various displays are in fact indications of drugs as opposed to some other indication of what the dog is perceiving?

THE WITNESS: Through training.

THE COURT: And have you kept track of the different ways that he displays and indicated that in  your training manuals?

THE WITNESS: Yes, sir.

THE COURT: Your training logs?

THE WITNESS: Yes, sir.

THE COURT: Why is it then that you are trying to train him to give the final trained response?

THE WITNESS: Honestly, because people like to see it on camera.

THE COURT: Now, is it possible for anyone other than you to observe the behavior that you believe indicates drugs that's not the trained -- final trained response? In other words, are you the only one that can tell when Drago's indicating on drugs when he doesn't give a formal trained response?

THE WITNESS: I would say to an extent, yes.

THE COURT: Okay. So largely we're dependent purely on your subjective determination of what Drago's behavior is to determine whether or not you have reasonable cause to conduct a search.

THE WITNESS: Yes, sir.

(Tr. 142:3-143:14.)[19]

---

[19] Sgt. Nope concurred that, generally speaking, there may be some situations in which a handler is able to assess factors that no other person could objectively identify, or that the court could not assess objectively without accepting the handler's testimony. (Tr. 200:4-22.)

## PROCEDURAL HISTORY

On November 16, 2016, Mr. Esteban and Mr. Tauteeia were indicted on one count of possession of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) & 18 U.S.C. § 2. (ECF No. 1). Both Defendants moved to suppress the evidence discovered as a result of the traffic stop and search of the vehicle. (ECF No. 23.)[20] On August 10, 2017, the court held an evidentiary hearing on the motion, wherein four witnesses testified and various exhibits were submitted from both sides. (ECF No. 37.) After the evidentiary hearing, the parties submitted briefing in support of their positions. (ECF Nos. 42, 49, 53.) On November 21, 2017, the court heard oral argument from the parties and took the motion under submission. (ECF No. 54.) The court has carefully considered the record evidence, briefing, oral arguments, and relevant legal authorities. For the reasons that follow, the court determines the stop in this case constituted an unlawful seizure and search.

## ANALYSIS

"A traffic stop is a seizure under the Fourth Amendment and must be objectively reasonable to pass constitutional muster." *United States v. Lyons*, 510 F.3d 1225, 1234 (10th Cir. 2007). "[B]ecause a routine traffic stop is more analogous to an investigative detention than a custodial arrest," courts analyze such stops under the two-part inquiry established in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Morgan*, 855 F.3d 1122, 1125 (10th Cir. 2017). Under this inquiry, the court asks whether a traffic stop is "(1) justified at its inception and (2) reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007) (quotation omitted).

---

[20] Mr. Taueetia filed a Motion to Join in Mr. Esteban's Motion to Suppress and submits on the same bases for suppression. (*See* ECF No. 24.)

As previously noted, "[t]he touchstone of [the court's] analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Morgan*, 855 F.3d at 1126 (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977)). "Reasonableness depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" *Morgan*, 855 F.3d at 1126 (quoting *Mimms*, 434 U.S. at 109).

Mr. Esteban asks the court to suppress all evidence resulting from the traffic stop in this case, arguing that the stop was invalid at its inception. Alternatively, even if the initial stop was valid, Mr. Esteban argues the scope and length of the stop was not reasonably related to its purpose. Finally, Mr. Esteban argues that the canine sniff was not sufficiently reliable to establish probable cause to search the vehicle.

"Judicial review of police-citizen encounters should proceed in a step-by-step fashion, focusing on each stage of the encounter," and courts "must insure that the requisite level of suspicion or cause is present at each stage of the encounter." *United States v. Richardson*, 69 F.3d 549, at \*4 (10th Cir. 1995) (unpublished Table Decision).[21] Thus, the court addresses Mr. Esteban's arguments at each stage of the stop.

## I. Trooper Tripodi provoked the traffic violation and, therefore, the stop was not valid at its inception.

"[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *Morgan*, 855 F.3d at 1125 (quoting *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995)). Trooper Tripodi observed that Mr. Esteban violated Utah traffic law when he failed to signal for a full two seconds before initiating

---

[21] This and all other unpublished decisions are not precedential, but are cited for their persuasive value. *See* Fed. R. App. 32.1; 10th Cir. App. R. 32.1.

the second lane change. Even so, Mr. Esteban argues that Trooper Tripodi induced the traffic violation here, and that a traffic stop should not be deemed reasonable when the officer provokes the violation.

In support of this position, Mr. Esteban points the court to a number of cases in various jurisdictions, though none are binding on this court. (*See* Def.'s Mem. in Support, p. 9-10, ECF No. 42; Reply, p. 4, ECF No. 53.) Of these cases, the court finds *United States v. Sigmond-Ballesteros*, 285 F. 3d 1117 (9th Cir. 2002), most analogous to the facts of this case. In *Sigmond-Ballesteros*, a border patrol agent stopped a truck partly based on the driver's attempt to "obscure" or "conceal" his face with his hand and the driver's "sudden move to a different lane" and move off the road to the shoulder. *Id.* at 1120–21. In suppressing the evidence found during the stop, the Ninth Circuit concluded that the facts identified above, even in consideration with other circumstances, did not provide a particularized and objective basis for the stop. *Id.* at 1121. The Circuit found the driver's attempts to conceal his face were a necessary reaction to the officer's shining his "alley light" into the driver's window. *Id.* at 1123. And the Circuit found that the defendant's driving behavior in that instance was a "rational reaction" to the officer's own driving alongside and tailgating the vehicle. *Id.* at 1122. The case is also distinguishable, however, because the Circuit noted that there was no evidence the driver broke any traffic laws in making lane changes. *Id.* at 1121 n.2.

Mr. Esteban also cites to the settled principle that law enforcement officers cannot create the exigency justifying their intrusion. *Cf. Kentucky v. King*, 563 U.S. 452, 462 (2011) (discussing the "police-created exigency" doctrine as limiting the exigent circumstances exception to the warrant requirement); *see McInerney v. King*, 791 F.3d 1224, 1235, 1238 (10th Cir. 2015) (citing the doctrine and finding it "clearly established that officers may not create

exigent circumstances to justify their actions"). The logic of this principle, that law enforcement officers cannot create the circumstance justifying an intrusion implicating the Fourth Amendment, clearly parallels Mr. Esteban's argument that an officer cannot engender or provoke a traffic violation forming the basis for the subsequent stop, particularly if the violation is a reasonable reaction to the officer's conduct.

At least one district court in this circuit has used similar reasoning to find driving conduct that could, in the absence of other circumstances, provide the basis for a traffic violation failed to do so because of the officer's conduct. In *United States v. Ochoa*, two troopers observed a Toyota following a Lincoln too closely, and they could not see a tag on the Toyota. 4 F. Supp. 2d 1007, 1009 (D. Kan. 1998). The officers believed the two vehicles were traveling together and starting following them. *Id.* The patrol car caught up to one of the vehicles and pulled into the passing lane to drive alongside it. *Id.* At that point, the second vehicle momentarily drifted a couple feet onto the right shoulder of the road and then back into its lane. *Id.* at 1011. Ultimately, the troopers pulled both vehicles over, citing the vehicle's drift as one of the bases for the stop. *Id.* In these circumstances, Judge Marten found the troopers had "caused or contributed to causing the drift" onto the shoulder and concluded that the drift did not constitute a traffic violation under the circumstances, where the record showed the officers were clearly looking for a reason to pull both vehicles over. *Id.* at 1012 & n.4. The Tenth Circuit Court of Appeals has considered and distinguished *Ochoa* in later cases without disavowing its reasoning. *See United States v. Worthon*, 520 F.3d 1173, 1180 (10th Cir. 2008) (noting *Ochoa*'s unique facts and distinguishing it because "the record does not show that the officer was the cause, in the way that the officer was a 'significant factor' in the violation in *Ochoa*"); *United States v. Rodriguez*, 215 F.3d 1338, at *4 (10th Cir. 2000) (unpublished Table Decision) (noting the circumstances did not

suggest the officer caused the driver's drifting onto the shoulder, thereby distinguishing *Ochoa*); *United States v. Ozbirn*, 189 F.3d 1194, 1199 (10th Cir. 1999) (noting the officer did not contribute to causing the motor home to drift onto the shoulder, unlike in *Ochoa*).

In the particular circumstances of this case, the court finds that Trooper Tripodi provoked the two-second traffic violation, though perhaps unintentionally. *But see Whren v. United States*, 517 U.S. 806, 813 (1996) (holding the subjective motives of the officer are not at issue in Fourth Amendment analysis). The Supreme Court has held that observed traffic violations provide "the 'quantum of individualized suspicion' necessary to ensure that police discretion is sufficiently constrained" in conducting traffic stops. *Id.* at 817–18 (quoting *Delaware v. Prouse*, 440 U.S. 648, 654–55 (1979)). But police discretion is not constrained when an officer's conduct provokes or substantially contributes to a violation, even unintentionally. Though Trooper Tripodi may not have been "tailgating," he significantly increased his speed, exceeding the acknowledged speed limit while also passing the emergency vehicles on the side of the road, and came up behind Mr. Esteban's vehicle very quickly. Trooper Tripodi recognized that Mr. Esteban could reasonably have thought that a police officer, approaching quickly from behind, wanted his vehicle to move out of the way as soon as practicable. (*See* Tr. 83:12-16.)

In addition, Mr. Esteban's conduct generally conformed to the safe-driving advice given by the Utah Driver Handbook, which notes that highway driving is "faster and conditions are not the same as in normal driving" and that a driver can be cited for "impeding traffic if a vehicle is following behind you in the left lane of travel on a multi-lane highway and you do not change lanes and allow for the other vehicle to pass." Utah Dep't of Public Safety, *Utah Driver Handbook* 8-8 (Aug. 2016). The Driver Handbook also notes that a driver must yield the right-of-way when emergency vehicles approach using sirens, emergency lights, or other warning

devices. *See id.* at 11-5. Though Trooper Tripodi did not have his emergency lights on while coming up quickly behind Mr. Esteban, the cars were simultaneously passing an emergency vehicle on the side. In these circumstances, the court finds a reasonable person would have noticed the police car's quick approach and reasonably assumed that they should change lanes as quickly as possible. Mr. Esteban clearly understood the two-second rule because he implemented it just seconds before while properly passing the earlier emergency vehicle.

Because the traffic violation that provided the basis for the stop was provoked by the officer's own driving conduct, the "minimal level of objective justification" for the stop falls away and the stop becomes unreasonable under the Fourth Amendment. *See United States v. Winder*, 557 F.3d 1129, 1133–34 (10th Cir. 2009). As a result, the court must exclude any evidence obtained from the invalid stop.

## II. Even if the stop were valid, Trooper Tripodi lacked reasonable suspicion to prolong it.

Disregarding the provocation of the traffic violation and assuming the initial traffic stop were valid, "[i]t is nevertheless clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Indeed, traffic stops must "last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). An individual "may not be detained even momentarily without reasonable, objective grounds for doing so." *Id.* at 498.

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States* ___ U.S. ___, 135 S. Ct. 1609, 1614, (2015) (citation omitted). "A seizure justified only by a police-observed traffic violation, therefore,

'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* at 1612 (quoting *Caballes*, 543 U.S. at 407).

"Beyond determining whether to issue a traffic ticket," ordinary inquiries incident to a traffic stop "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 135 S. Ct. at 1615. An officer may also conduct "certain unrelated checks during an otherwise lawful traffic stop," but "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* "Authority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 1614. "Importantly, it is the government's burden to prove the reasonableness of the officer's suspicion." *Hernandez*, 847 F.3d at 1268.

The court finds Trooper Tripodi improperly extended the traffic stop based on factors that fail to give rise to objectively reasonable suspicion of criminal activity. Mr. Esteban would have the court take Trooper Tripodi at his word when he told the driver that he would not be citing him, and find that the trooper should have let them on their way once he confirmed the validity of the license and registration. *E.g.*, *United States v. McSwain*, 29 F.3d 558, 561 (10th Cir. 1994) (finding the officer's sole purpose in stopping the vehicle was to check its temporary registration sticker, and once he saw it was valid "the purpose of the stop was satisfied," requiring the officer to end the detention). But Trooper Tripodi's testimony that he must "document" all stops, even those where he has already determined he will not issue a citation, is based on his supervisor's policy, which, though vague and unwritten, is reasonable conduct if not simply used to justify extending the detention without reasonable suspicion. Moreover, an officer may conduct warrants and license checks and inspect the vehicle's proof of insurance and registration.

*Rodriguez*, 135 S. Ct. at 1615. An officer may also call for a canine sniff of the vehicle if the sniff does not prolong the stop. *Id.* at 1616. And the total duration of the stop here was within Trooper Tripodi's average time for conducting routine traffic stops.[22]

Still, an officer's "diligence" in conducting a stop is not solely measured by the stop's duration. Rather, the court must scrutinize "what the officer actually did and how he did it" in order to determine if the officer was "reasonably diligent in pursuing the traffic-related purpose of the stop." *Id.* Indeed, "[t]he critical question" is not whether some unrelated inquiry "occurs before or after the officer issues a ticket," but whether that unrelated conduct "prolongs—*i.e.*, adds time to—the stop." *Id.* (internal quotations omitted). *Cf. Caballes*, 543 U.S. 405, 408 (2005) ("[T]he [state court] judges carefully reviewed the details of Officer Gillette's conversations with respondent and the precise timing of his radio transmissions to the dispatcher to determine whether he had improperly extended the duration of the stop to enable the dog sniff to occur. We have not recounted those details because we accept the state court's conclusion that the duration of the stop in this case was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop.").

Here, Trooper Tripodi engaged in a number of unrelated inquiries that, taken together, prolonged this traffic stop without articulable, reasonable suspicion. First, Trooper Tripodi spent about a minute attempting to convince Mr. Esteban to accompany him to his vehicle, not for safety reasons or for the purposes of documenting the stop, but solely (and admittedly) to get more information unrelated to the purpose of the stop. Then, almost immediately upon entering

---

[22] Mr. Esteban attempted to show that Trooper Tripodi sometimes completes his traffic stops faster than his average of ten to fifteen minutes, but the law of averages would suggest that some stops take more and less time than ten minutes. As further discussed, the total duration of a traffic stop is not the only way, or even the proper way, to analyze the reasonableness of a traffic stop. At its core, the question of reasonable diligence in completing a traffic stop revolves around the totality of the officer's conduct and manner of execution. *Rodriguez*, 135 S. Ct. at 1616.

his vehicle, Trooper Tripodi called for the canine sniff. This request in isolation may not prolong the stop, but its timing shows that the nature of the stop had already transitioned from documenting to investigating. In addition, Trooper Tripodi did not call for the records checks until after Trooper Loveland arrived and after he had been filling out the citation report for a few minutes. Again, this specific conduct alone may not have prolonged the stop, but the court finds the timing of the call to dispatch relevant in these circumstances.

While the above items each might be considered ordinary or reasonable incidents of a traffic stop, even if their occurrence or timing suggests they were unrelated to that mission, the Triple I check is not. *Cf. Rodriguez*, 135 S. Ct. at 1615 (noting that license validity, wants and warrants checks, and document inspection all "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly," and distinguishing a dog sniff, which "[l]ack[s] the same close connection to roadway safety as the ordinary inquiries"); *see Richardson*, 69 F.3d 549, at *11 n.8 (McKay, J., dissenting) (observing that "[c]omputer checks done by an officer in the course of a *Terry*-stop investigation should have a nexus with the purpose of the stop" and that "[t]he Triple-I check requested by Officer Swain in this case was improper because the magistrate judge found that it was not linked to the stop for speeding"). Because it seeks an individual's criminal history, the Triple I check is not an "ordinary incident" of a traffic stop, and Trooper Tripodi admits it was not related to this stop in any case.[23] Calling for the Triple I check would properly have required some articulable, reasonable suspicion here, particularly in combination with the other conduct identified above.

_____

[23] Trooper Tripodi testified that the Triple I check was for "officer safety issues," as well as "other means," and the Tenth Circuit has previously confirmed the safety interest in Triple I checks. *See United States v. McRae*, 81 F.3d 1528, 1536 (10th Cir. 1996) ("Triple I checks are run largely to protect the officer. Considering the tragedy of the many officers who are shot during routine traffic stops each year, the almost simultaneous computer check of a person's criminal record, along with his or her license and registration, is reasonable and hardly

Trooper Tripodi did not have particularized and objective reasonable suspicion to prolong the stop for unrelated criminal investigation. The only factors that Trooper Tripodi described as contributing to his suspicion of the vehicle were the positioning of the driver behind the pillar of the door; the out-of-state license plate; the occupants' "taking shifts and driving straight through" to Minnesota; the passenger's answering and shift in conversation; and the driver's hesitation to return to his vehicle to talk further. These factors, alone and taken together, do not constitute reasonable suspicion that criminal activity was afoot.

First, the Trooper acknowledged that the driver was driving safely with his hands on the wheel, and that his positioning may have been the result of his size. Second, the Tenth Circuit has disavowed in no uncertain terms the consideration of the out-of-state origin of a vehicle as indicative of criminal activity:

> It is wholly improper to assume that an individual is more likely to be engaged in criminal conduct because of his state of residence, and thus any fact that would inculpate every resident of a state cannot support reasonable suspicion. Accordingly, it is time to abandon the pretense that state citizenship is a permissible basis upon which to justify the detention and search of out-of-state motorists, and time to stop the practice of detention of motorists for nothing more than an out-of-state license plate.
>
> . . . Absent a demonstrated extraordinary circumstance, the continued use of state residency as a justification for the fact of or continuation of a stop is impermissible.

---

intrusive."). But generalized "safety concerns" were not implicated in any way by the circumstances of this stop, so the Triple I check cannot be said to be a part of the stop's "mission" to complete "documentation" of a minor traffic violation. Trooper Tripodi admitted that asking Mr. Esteban back to his vehicle was not particularly safe, and no factors reasonably support suspicion of criminal activity or any unsafe conduct during the traffic stop, as further discussed *infra*. In these specific circumstances, the court finds that a reasonable officer would not be concerned for his safety such that the "ordinary incidents" of a traffic stop (license validity, wants and warrants, inspection of vehicle registration and insurance) were not adequate to accomplish the purposes of this stop. *See Rodriguez*, 135 S. Ct. at 1615. Indeed, the circumstances strongly suggest the Triple I check was purely for investigative purposes here.

*Vasquez v. Lewis*, 834 F.3d 1132, 1138 (10th Cir. 2016), *cert. denied*, 137 S. Ct. 1580, 197 L. Ed. 2d 705 (2017). As *Vasquez* recognizes, and Trooper Tripodi testified, *any* surrounding state could be a drug source state. Characteristics that capture a large swath of the innocent motoring public cannot support particularized, objective suspicion of criminal activity. *See Reid v. Georgia*, 448 U.S. 438, 441 (1980) (holding that circumstances that "describe a very large category of presumably innocent travelers" are insufficient to support reasonable suspicion).

Next, while speaking with the occupants, Trooper Tripodi acknowledged that he stood at the passenger window and that he initiated the first change in conversation from the traffic stop to travel plans. Trooper Tripodi also acknowledged that the defendant's answers to his questions were satisfactory, if not elaborate. A question about snow in Utah in October is not out of the ordinary. The court finds that nothing about the passenger's conversation could reasonably add to the Trooper's suspicions in these circumstances. *See Karam*, 496 F.3d at 1164 ("Vague conversation is not alone indicative of wrongdoing . . . ."). Nor could the described travel plans add any suspicion in these circumstances. It is not inconsistent or improbable by any means to drive straight from California to Minnesota in shifts with a companion. *Cf. United States v. Pettit*, 785 F.3d 1374, 1382 (10th Cir. 2015) (noting reluctance to find travel plans implausible even where the plans are "unusual or strange"). Finally, a driver's hesitation in answering questions—particularly a request to accompany an officer to his vehicle—is not abnormal under these circumstances. Nothing in the law precludes a driver from declining such a request. *See Terry*, 392 U.S. at 34 (White, J., concurring) ("Of course, the person stopped is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest . . . ."). Trooper Tripodi did not testify to any extreme or consistent nervousness in the occupants' behavior or conversation. *See Vasquez*, 834 F.3d at 1138 ("We have repeatedly held that

nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on . . . nervousness . . . as a basis for reasonable suspicion . . . must be treated with caution." (quoting *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997))).

The Tenth Circuit recognizes that while "even seemingly innocent factors may be relevant to the reasonable suspicion determination, 'some facts are so innocuous and so susceptible to varying interpretations that they carry little or no weight.'" *Karam*, 496 F.3d at 1163 (quoting *United States v. Mendez,* 118 F.3d 1426, 1431 (10th Cir. 1997)). Even considering these circumstances together, *United States v. Arvizu*, 534 U.S. 266, 273 (2002), Trooper Tripodi's generalized explanation of his suspicion and identification of the factors discussed above do not cross the low threshold for reasonable suspicion of criminal activity. *See Hernandez*, 847 F.3d at 1268 (observing that "while 'deference is to be accorded a law enforcement officer's ability to distinguish between innocent and suspicious actions . . . [i]nchoate suspicions and unparticularized hunches . . . do not provide reasonable suspicion'" (quoting *Wood*, 106 F.3d at 946)).

In conclusion, the court finds that Trooper Tripodi's shift to substantially investigatory conduct—evidenced in particular by the Triple I check, but also by his manner of execution of both the "ordinary" and unrelated incidents of the stop—prolonged the stop without a particularized and objective basis for suspecting criminal conduct. *See Pettit*, 785 F.3d at 1379. Therefore, the evidence resulting from the stop must be suppressed on this ground as well.

**III.**    **Even if the stop were not unreasonably prolonged, the canine indication was not sufficiently reliable to provide probable cause for the search.**

The Supreme Court has held that a certified-narcotics dog sniff of the exterior of a vehicle during a lawful traffic stop does not implicate Fourth Amendment concerns where it does not measurably prolong the stop. *Rodriguez*, 135 S. Ct. at 1615; *Caballes*, 543 U.S. at 409. Where there is no challenge to the canine's training or certifications, a canine indication or alert can generally provide probable cause to search a vehicle. *See Caballes*, 543 U.S. at 409 (observing that a "well-trained" narcotics-detection dog can disclose the presence or absence of narcotics); *United States v. Engles*, 481 F.3d 1243, 1245 (10th Cir. 2007) (holding it "undisputed that once the [drug] dog alerted to the trunk and side door, the officers had probable cause to search the car and its contents"); *United States v. Ludwig*, 641 F.3d 1243, 1250–51 (10th Cir. 2011) (finding "a positive alert by a certified drug dog is generally enough, by itself, to give officers probable cause to search a vehicle"). But defendants can challenge a canine's training and reliability. *E.g.*, *Ludwig*, 641 F.3d at 1251 (noting that "it surely goes without saying that a drug dog's alert establishes probable cause only if that dog is reliable"); *United States v. Ludwig*, 10 F.3d 1523, 1528 (10th Cir. 1993) (observing that "[a] dog alert might not give probable cause if the particular dog had a poor accuracy record").

Even in the absence of a "final indication," the Tenth Circuit has concluded that probable cause can exist solely on a dog's "alert." *United States v. Parada*, 577 F.3d 1275, 1281–82 (10th Cir. 2009). The Tenth Circuit recognizes that a dog's "alert . . . does not implicate the precision of a surgeon working with scalpel in hand." *United States v. Rosborough*, 366 F.3d 1145, 1153 (10th Cir. 2004). Probable cause does not require such exaction. Moreover, the Tenth Circuit has "typically rel[ied] on the dog's certification as proof of its reliability" and found it "safe to

assume that canine professionals are better equipped than judges to say whether an individual dog is up to snuff." *Ludwig*, 641 F.3d 1243, 1251 (10th Cir. 2011).[24]

This case sheds new light on the Tenth Circuit's broad proclamations and comfort in canine sniffs and their certifiers. As an initial matter, the court notes that the record here presents a more thorough and credible challenge to this canine's training *and* reliability. *Compare Parada*, 577 F.3d at 1283 (noting that "[t]he only evidence Mr. Parada submitted concerning [the dog]'s reliability was an affidavit from a defense expert who concluded that '[t]he methodology used to train, maintain, and use this detector dog in the field does not comply with scientific principles demanded by the use of operant conditioning' and does not comply with 'established industry standards of dog training and utilization'); *Ludwig*, 641 F.3d at 1251 (noting that there was "no suggestion that the California Narcotic Canine Association, the organization that credentialed the drug dog in this case, is all smoke and mirrors"); *Ludwig*, 10 F.3d at 1528 (noting that the evidence in the case showed, amazingly, that the dog had "never falsely alerted").

Mr. Esteban has presented compelling evidence that the canine stuff conducted here was unreliable. First, Mr. Esteban has directly challenged the certifying program. Dr. Myers testified

---

[24] In *Caballes*, Justice Souter challenged the courts' reliance on a "premise that experience has shown to be untenable, the assumption that trained sniffing dogs do not err." 543 U.S. at 410 (Souter, J., dissenting). Justice Souter's reasoning bears repeating here: "The point is simply that the sniff and alert cannot claim the certainty that [*United States v. Place*, 462 U.S. 696 (1983)] assumed, both in treating the deliberate use of sniffing dogs as *sui generis* and then taking that characterization as a reason to say they are not searches subject to Fourth Amendment scrutiny. And when that aura of uniqueness disappears, there is no basis in *Place*'s reasoning, and no good reason otherwise, to ignore the actual function that dog sniffs perform. They are conducted to obtain information about the contents of private spaces beyond anything that human senses could perceive, even when conventionally enhanced. The information is not provided by independent third parties beyond the reach of constitutional limitations, but gathered by the government's own officers in order to justify searches of the traditional sort, which may or may not reveal evidence of crime but will disclose anything meant to be kept private in the area searched." *Id.* at 413.

to three fundamental, widely-accepted scientific principles for ensuring the reliability of test results, two of which (double-blind testing and formal randomization) the POST program does not apply. Sgt. Nope's testimony repeatedly suggested the POST training regime was aimed more towards expeditious training and certification of canines than to applying the most reliable, if tedious, scientific standards to training and testing. While the court is sympathetic to whatever temporal and monetary limitations impact the program, the innocent public should not lose constitutional protections by bearing the unreasonable consequences of budgetary limitations.[25]

In addition, the evidence shows Drago had numerous false alerts around the relevant time, though the officers treat false alerts (if not in a controlled setting) as "inconclusive." (*E.g.*, Tr. 129:1-5.) No explanation was provided in several of the false alerts/inconclusive incidents highlighted. And evidence was presented that proper reinforcement of Drago's trained response has been undercut by his handler. Moreover, the POST certifications show that patrol officers re-certify each other. (*See* Tr. 191:17-192:2.)

Based on his training and experience as a handler and in developing the POST program, Sgt. Nope testified that the canine "indication" in this case was reliable and no cuing occurred. But the court finds this testimony lacks credibility in light of Sgt. Nope's personal interest in upholding the training program's validity, which has been applied to train a substantial number of canines in this country and abroad. Tellingly, Sgt. Nope has never testified that a canine sniff he reviewed was unreliable. Moreover, Sgt. Nope's testimony that officers and observers can be

---

[25] Though the scientific challenge to the program's standards is serious, the court credits the applied experience of the professional law enforcement canine trainers in developing and running the program. At least at this point, without additional information, the court is unable to find the POST training program unreliable in all instances, but it is merely one of the factors the court considers in the unreliability analysis. The court does, however, advise that the program should be thoroughly reviewed by independent experts not deeply invested in promoting the success of the program.

taught to avoid cuing, when considered against Dr. Myers' testimony that cuing is primarily unintentional, appears both overly optimistic and largely flawed.

In stark contrast, Dr. Myers testified that Drago's "indication" here was of "no value . . . whatsoever." Dr. Myers asserted that the only way a properly-trained canine communicates the presence of narcotics is through the final trained response. The officer may suspect, but without the trained response, the canine has not communicated that it has, in fact, identified the odor attached to that training. Despite this compelling testimony, and despite the Tenth Circuit's desire to provide "bright-line" rules for when officers may rely on canine alerts, *Ludwig*, 641 F.3d at 1251, the Circuit has not required the presence of a final trained response and cautioned against a judge's second-guessing a dog's alert.

Yet what happens when the canine alert or indication is not based on objectively observable facts, but solely on the officer's subjective interpretation of the dog's behavior? In this case, the officers have conceded that, at least to some extent and in some instances, the officer's subjective determination of a number of canine behaviors can be determinative of the decision to conduct a search. Indeed, without Trooper Loveland's testimony, the dash camera video does not reveal any objective basis with which to view many of the behaviors Loveland identified. Even Trooper Loveland was confused as to why Drago did not sit into his final trained response. Implicit in Trooper Loveland's training logs is the recognition that the trained final response is a necessary component of Drago's training and, consequently, his reliability. But Trooper Loveland asserted that the final trained response is simply for show, "because people like to see it." Sgt. Nope agreed—the final trained response may be the best evidence, but not the only evidence, because POST's "alert matrix" details a wide variety of canine behaviors, any one of which, if sufficiently profound, can alone provide probable cause for a search.

The Supreme Court has "'repeatedly rejected' a subjective approach" in its Fourth Amendment jurisprudence, "asking only whether 'the circumstances, viewed *objectively,* justify the action.'" *King*, 563 U.S. at 464 (quoting *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006)). The Court explained:

> The reasons for looking to objective factors, rather than subjective intent, are clear. Legal tests based on reasonableness are generally objective, and this Court has long taken the view that "evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer."

*Id*. (quoting *Horton v. California*, 496 U.S. 128, 138 (1990)). Courts regularly defer to an officer's application of his knowledge and experience. But "officers must apply their experience so that the courts can make informed decisions on whether their suspicions are reasonable." *United States v. Williams*, 808 F.3d 238, 253 (4th Cir. 2015). "Were it otherwise, an experienced police officer's recitation of some facts, followed simply by a legal catchphrase, would allow the infringement of individual rights with impunity." *Id.*; *accord United States v. Cortez*, 449 U.S. 411, 418 (1981) (emphasizing that the "demand for specificity in the information upon which police action is predicated is *the central teaching of this Court's Fourth Amendment jurisprudence*." (quoting *Terry*, 392 U.S. at 21, n.18)).

The Tenth Circuit has also made clear that "that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause," *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1219 (10th Cir. 2008) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)), because "[p]robable cause is measured against an objective standard of reasonableness," *United States v. Zamudio-Carrillo*, 499 F.3d 1206, 1209 (10th Cir. 2007). Though "the agent's experience may provide a background against which the relevant facts may be assessed, his analysis must be based on 'objective observations,' and the inferences he draws

must be objectively reasonable." *Sigmond-Ballesteros*, 285 F.3d at 1123 (quoting *Cortez,* 449 U.S. at 418); *see Johnson v. Campbell*, 332 F.3d 199, 210 (3d Cir. 2003) ("The availability of objective facts justifying a seizure is of paramount importance."). In all other instances, courts have long recognized that constitutional rights cannot be defeated by an officer's mere suspicion. To allow the officer's subjective understanding of a canine's behavior, not objectively verifiable by the court, would constitute a flagrant exception to this important principle.

On this record, the court finds that Drago's indication in this case was too subjective and unreliable to support probable cause. For the most part, the alerts and indication were only able to be perceived and assessed by Trooper Tripodi and Sgt. Nope. But even Sgt. Nope could not identify with any objective clarity the behavior supporting his conclusion. According to an expert canine behavior researcher, Drago's behavior did not effectively communicate the presence of narcotics. Assuming a rigorous training program and no other plausible challenge to the canine's reliability, the lack of an objective final trained response may not present as much of a problem as in this case. The court recognizes that a probable cause determination is based on the totality of circumstances, *Florida v. Harris*, 568 U.S. 237, 244 (2013), and "is not a precise quantum of evidence" that requires "the suspect's guilt to be more likely true than false," *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (internal quotation marks omitted) (quoting *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011)). But, in light of the challenges to this training program and the questions about Drago's performance, as well as the courts' adherence to objectively identified grounds supporting an officer's inferences, the court does not find that probable cause can rest on the officer's own subjective assessment of a canine's behavior that could indicate any number of circumstances.

"Each case must rise or fall on the particular facts of that case." *United States v. De La Cruz*, 703 F.3d 1193, 1200 (10th Cir. 2013). Serious deficiencies in reliability lead the court to conclude that, in these circumstances, Drago's indication did not provide probable cause to search Mr. Esteban's vehicle.[26] For this reason, also, the evidence found from the illegal search must be suppressed.[27]

## CONCLUSION

For each of these reasons, the court GRANTS the motion to suppress, (ECF Nos. 23 & 24), and suppresses the evidence found as a result of the search of Mr. Esteban's vehicle in violation of his Fourth Amendment rights. "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 517 U.S. at 813. The court merely upholds and reinforces this standard today, thereby ensuring that reasonableness—that timeless and always objective standard—remains the touchstone of the Fourth Amendment.

DATED this 22nd day of December, 2017.

BY THE COURT:

Clark Waddoups
United States District Judge

---

[26] The government argues that the troopers acted in good faith reliance on the canine indication here, and that the court should not exclude the evidence in this case based on the good faith exception to the exclusionary rule. The Tenth Circuit has squarely rejected this argument in *United States v. Clarkson*, 551 F.3d 1196, 1204 (10th Cir. 2009) ("Were the good-faith exception to apply in this circumstance, the improper police conduct of conducting a search with an untrained or unreliable dog would not be effectively deterred. Such a rule would minimize motivation for police officers to ensure a dog is actually trained or reliable before deploying it. Allowing the good-faith exception to apply in this situation would therefore contravene the purpose of the exclusionary rule.").

[27] Mr. Esteban also raises a challenge to a Drago's ability to solely identify contraband now that many states across the nation have legalized or decriminalized marijuana. (*See* Mem. in Support 36-39.) This challenge is an intriguing one currently facing many state courts. Multiple bases exist for suppression here, however, so the court will not embark on an analysis of a novel and controversial issue. Moreover, marijuana is still illegal as a matter of federal law. Therefore, the court declines to address the argument in this case.